# UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

|  |  |
|---|---|
| Z.D.,<br>A.B.,<br>R.A.,<br>N.B.,<br>A.E.,<br>N.E.,<br>V.G.,<br>R.K.,<br>E.M.,<br>A.N.,<br>M.N.,<br>C.O.,<br>R.O.,<br>M.O.,<br>A.R.,<br>F.S., and<br>G.U.,<br><br><br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES<br><br>Office of the Chief Counsel<br>5900 Capital Gateway Drive<br>Mail Stop 2120<br>Camp Springs, MD 20588-0009<br><br>UR MENDOZA JADDOU, DIRECTOR OF UNITED STATES CITIZENSHIP AND IMMIGRATION SERVICES<br><br>Office of the Chief Counsel<br>5900 Capital Gateway Drive<br>Mail Stop 2120<br>Camp Springs, MD 20588-0009<br><br><br>U.S. DEPARTMENT OF HOMELAND SECURITY | Civil Action No. 1:23-CV-943<br><br><br>**COMPLAINT** |

Office of the General Counsel
U.S. Department of Homeland Security
245 Murray Lane, SW
Mail Stop 0485
Washington, DC 20528-0485

and

ALEJANDRO MAYORKAS, SECRETARY OF
HOMELAND SECURITY

Office of the General Counsel
U.S. Department of Homeland Security
245 Murray Lane, SW
Mail Stop 0485
Washington, DC 20528-0485

Defendants.

## INTRODUCTION AND SUMMARY

1.    This lawsuit arises out of a decision by the United States Citizenship and
Immigration Services ("USCIS" or "the Agency") to change the way it processes asylum
applications. When Plaintiffs filed their asylum applications (Forms I-589), the Agency
processed applications under a first-in, first-out ("FIFO") system—i.e., as in an ordinary queue,
where individuals who have been waiting for relief the longest have their applications processed
first. But on January 29, 2018, the Agency switched to the opposite system, known as last-in,
first-out ("LIFO"), in which the first applications processed are those from individuals who have
been waiting the *shortest* time. Indeed, under the Agency's FIFO system, new applicants
automatically cut to the very front of the line, while those who have already been waiting the
longest are pushed further back. The Agency implemented this switch in application-processing

rules without reasoned consideration of the need for, or consequences of, such an action—the very definition of arbitrary and capricious action prohibited by the Administrative Procedure Act ("APA").  Additionally, the Agency's new LIFO system not only delayed the processing of applications (such as Plaintiffs') already pending, but effectively made the delay *indefinite*—thereby violating the APA's prohibition on agencies imposing unreasonable delays.  This suit seeks to remedy both violations.

2.      The Immigration and Nationality Act ("INA") allows a noncitizen who is present or arriving in the United States and fears persecution in their country of origin to seek asylum.  8 U.S.C. § 1158(a)(1).  Because of the importance of protecting individuals from violence and persecution, the INA allows non-citizens to apply for asylum "irrespective of [their immigration] status."  *Id*.  Asylum may be granted to any applicant in the United States who is a refugee not statutorily barred from asylum status. 8 U.S.C. §§ 1158(b)(1)(A); 1101(a)(42)(A).

3.      Because so much hangs in the balance while an individual's asylum application is pending—including the applicant's safety, stability, mental health, livelihood, and ability to be with family—the INA mandates a prompt agency decision on the application.  Specifically, the INA provides that "in the absence of exceptional circumstances," the agency "shall commence" its adjudication process (through an "initial interview or hearing") "not later than 45 days after the date an application is filed," and the agency "shall … complete[]"a "final administrative adjudication of the asylum application" "within 180 days after the date an application is filed."  8 U.S.C. § 1158(d)(5)(A).

4.      Plaintiffs in this case filed their applications for asylum between January 1, 2015, and January 27, 2018.  During that time, USCIS was scheduling initial interviews on a FIFO basis:  Applications were thus processed in the order they arrived, with earlier-filed applications

being processed (i.e., scheduled for initial interviews and provided final decisions) before later-filed ones. Accordingly, every day Plaintiffs moved closer to the front of the line.

5.      On January 29, 2018, however, USCIS switched to a LIFO system, in which the *most recent* applications are processed first, while the earlier-filed ones (i.e., the ones that have been waiting the longest) fall further behind as they wait until all applications filed after them are processed. Plaintiffs will not see their applications processed until the Agency first processes *every* application filed after January 29, 2018. Plaintiffs are thus not only still waiting for their initial asylum interview, but also face the prospect that—because new applications are being filed faster than the agency can process them—they will never get one.

6.      USCIS's ostensible purpose in effecting this switch from FIFO to LIFO was to reduce a growing application backlog supposedly created by "fraudulent" or "meritless" applications filed only to gain an Employment Authorization Document ("EAD"), which becomes available to an applicant after the asylum application has been pending for 180 days. But USCIS performed no meaningful analysis to determine whether, or to what extent, such applications were actually contributing to the backlog and whether, or to what extent, a switch from FIFO to LIFO would deter such applications or alleviate the backlog.

7.      In fact, USCIS knew that the growing backlog had obvious other causes. For instance, there can be no dispute that much of the backlog was due to an increase in *legitimate* asylum applications filed in response to growing violence and persecution in Central America, which in turn caused increasing numbers of individuals to flee to this country. Moreover, USCIS diverted asylum officers from conducting initial interviews to perform credible-fear interviews at the U.S.-Mexico border. The result, as the DHS Office of Immigration Statistics (OIS) Annual Flow Report on Refugees and Asylees: 2016 (Jan. 2018) recognized, was that USCIS worsened

the asylum application backlog by meeting the increased number of applications with *fewer*

adjudicators:

> The growing number of affirmative applications has been served
> by a shrinking number of dedicated adjudicators as a large number
> of USCIS asylum officers have been diverted from the affirmative
> interview process to conduct credible and reasonable fear
> screening interviews. As a result, and despite increased staffing
> within the USCIS Asylum Division, the number of pending
> affirmative applications climbed to almost 200,000 by the end of
> 2016, the highest number since 2004.[1]

8.      USCIS compounded its speculation about the cause of the backlog with fallacious

post-hoc-ergo-propter-hoc reasoning.  Based solely on the happenstance that asylum applications

declined under a LIFO system implemented during a much earlier time period (before any

Plaintiffs filed an application) and under very different circumstances (e.g., many fewer asylum

applications), USCIS assumed the same would happen after 2018.

9.      Worse, USCIS proceeded with the switch to LIFO even though it knew that the

switch would *not* reduce fraudulent or meritless applications.  As internal USCIS emails reveal,

even on the agency's own theory, LIFO could reduce such applications "only if EOIR [the

Executive Office for Immigration Review] fast tracks our referrals" to immigration court.[2]

EOIR did not—and does not—do so, however.

10.     Unsurprisingly, the switch to LIFO has had no lasting benefits.  Since the January

29, 2018, switch from FIFO to LIFO, the asylum backlog at USCIS has grown from 311,000

---

[1] *See* https://www.uscis.gov/sites/default/files/document/reports/DHS_2016_Refugee_and_Asylee_Report.pdf.
[2] *See* USCIS email from Ted Kim to John Lafferty, December 18, 2017, located at USCIS's Seventh Revised
Response (S85.1) to Tahirih Justice Center's FOIA Request at 81. The necessity of this condition follows from
USCIS's belief that fraudulent or meritless applications were filed to wrongfully obtain temporary employment
authorization during the pendency of their cases.  If the agency rushed through new asylum applications and referred
new applicants to immigration court only for those applicants to sit in EOIR's multi-year backlog (during which
delay, the applicants would be granted temporary work authorization anyway), USCIS's actions would not prevent
anyone from obtaining work authorization, and hence—even on the agency's own theory—would do nothing to
reduce the supposed temptation to file fraudulent or meritless applications.

applications to 470,786 applications.[3]  Moreover, the USCIS Ombudsman Annual Report for

2022 acknowledges that "USCIS' existing asylum system cannot meaningfully reduce its

backlog, let alone keep pace with incoming applications."[4]

11.    Not only did the agency fail to rationally consider whether a switch to LIFO

would actually yield the benefits sought, but it also failed to take account of the costs that such a

switch would impose.  Specifically, USCIS accorded no weight to the harm that the switch

would have on applicants who had already been waiting years for an interview.  That harm has

been severe.  For example, because of their unresolved immigration status, Plaintiffs have

suffered emotional distress (including anxiety and depression) caused by prolonged uncertainty

as to their immigration status; they have lost employment opportunities caused by employer

concerns about their long-term immigration status and about legal burdens that employers hiring

such applicants might have to shoulder; they have lost educational opportunities because of

inability to qualify for scholarships; they have suffered unduly from medical problems because

of lack of access to Medicaid; they have suffered from hunger because of inability to qualify for

food stamps; they have suffered from fear because of the constant threat that they will be forced

to return to their country of origin; and they have suffered heartbreak because of multi-year

separations from family members.

12.    Facing pressure from the White House and the then-Secretary of Homeland

Security to act quickly, USCIS failed to conduct a rational assessment of either the costs or

benefits of its policy switch.  Contemporaneous internal USCIS emails reveal that USCIS made

---

[3] *See* USCIS Press Release, 01/31/2018 at https://www.uscis.gov/archive/uscis-to-take-action-to-address-asylum-backlog.  See also USCIS's Seventh Revised Response (S85.1) to Tahirih Justice Center's FOIA Request at 66-67. *See also* https://www.uscis.gov/sites/default/files/document/reports/DHS_2016_Refugee_and_Asylee_Report.pdf.
[4] U.S. DEPARTMENT OF HOMELAND SECURITY, Citizenship and Immigration Services Ombudsman Annual Report, at ix and 42 (June 30, 2022), available at https://www.dhs.gov/sites/default/files/2022-06/CIS_Ombudsman_2022_Annual_Report_0.pdf (hereinafter "Citizenship and Immigration Services Ombudsman Annual Report 2022").

the change to LIFO under the "intense" "focus" of the "WH [White House] and DHS hq,"[5] and that "S1 [then-Secretary of Homeland Security Kirstjen Nielsen] was keenly interested in LIFO for asylum cases and want[ed the agency] to implement that as quickly as possible."[6]

13.     USCIS implemented the LIFO switch eight days after that email was sent, but delayed public notice of the change so that "advocates/attorneys" would not "figure out what's up."[7]

14.     In sum, USCIS's conduct constitutes unlawful arbitrary and capricious agency action and is contrary to law.  Under the APA, "[t]he reviewing court shall … hold unlawful and set aside agency action … found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  As set forth in Count I, USCIS's January 29, 2018, switch from FIFO to LIFO violated the APA in each of these stated ways.  Because USCIS acted in an arbitrary and capricious manner when it made the January 29, 2018, switch from FIFO to LIFO, this Court should set aside USCIS's unlawful switch, returning the scheduling of affirmative interviews to the preexisting FIFO system.

15.     Separately, because the agency's switch from FIFO to LIFO has led to an unreasonable—indeed, indefinite—delay in the adjudication of Plaintiffs' asylum applications, the Court should, at a minimum, compel the agency to adjudicate Plaintiffs' applications without further delay.  5 U.S.C. § 706(1).

## JURISDICTION AND VENUE

16.     This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

---

[5] USCIS email from Francis Cissna to Nuebel Kovarik, December 16, 2017, located at USCIS's Seventh Revised Response (S85.1) to Tahirih Justice Center's FOIA Request at 82.
[6] USCIS email from Francis Cissna to Jennifer Higgins et al. January 20, 2018, located at USCIS's Seventh Revised Response (S85.1) to Tahirih Justice Center's FOIA Request at 84 (emphasis in original).
[7] See USCIS Asylum Division Q&A regarding the change, located at USCIS's Seventh Revised Response (S87.1) to Tahirih Justice Center's FOIA Request at 75.  The Asylum Division of USCIS adjudicates affirmative asylum applications.

17.     Venue is proper in this District under 28 U.S.C. § 1391(e)(1).  Defendant USCIS

has its national headquarters in Camp Springs, Maryland.   Nine Plaintiffs also reside in

Maryland.

**<u>PARTIES</u>**

18.     Plaintiff Z.D. is a resident of Edgewood, Maryland.  She filed her asylum

application on January 16, 2018.  Her endless wait for a decision has exacerbated the trauma she

experienced in her home country, and she now suffers from depression and has trouble

concentrating.

19.     Plaintiff A.B.is a resident of Gwyn Oak, Maryland.  She filed her asylum

application on February 29, 2016.  The prolonged delay in adjudicating her application has

caused her stress and anxiety with resulting symptoms of difficulty sleeping and high blood

pressure.  Her mental distress has been exacerbated because she cannot qualify for Medicare in

her current immigration status.

20.     Plaintiff R.A. is a resident of Sugar Land, Texas.  She filed her asylum application

on July 5, 2016.  Her long wait for adjudication of her application is causing her to suffer mental

distress associated with uncertainty of her legal status, re-traumatization throughout the lengthy

legal process, limitations on her ability to travel, and inability to access adequate support for her

son, who requires special education.

21.     Plaintiff N.B. is a resident of Houston, Texas.  She filed her asylum application on

June 30, 2016.  Her unending wait for a decision has caused her to suffer anxiety and difficulty

sleeping.  She is ineligible for Medicaid, which has compounded her mental health issues.  She

also has had difficulty securing a job.  For example, although she sought employment as a

commercial delivery driver, she was unable to obtain a commercial driver license because of her immigration status.

22.    Plaintiff A.E. is a resident of Rockville, Maryland.  She filed her asylum application on December 21, 2017.  As a result of her unresolved immigration status, she has been diagnosed with anxiety and depression.  She had a tentative job offer withdrawn because of her uncertain immigration status.  In 2019, she applied for a language program at a university but was denied because of her unresolved immigration status.  She has been unable to get public assistance to help with housing and medical costs.  She was unable to secure Workforce Housing in Washington D.C. because of her unsettled immigration status.

23.    Plaintiff N.E. is a resident of Fort Washington, Maryland.  She filed her asylum application on September 18, 2015.  The long and continuing delay in its adjudication has caused her to suffer from undue stress, depression, and anxiety which have not yielded to the therapy and medications she has tried.  In her own words, "It's really hard not knowing where the case will go."  As she waits, she has been unable to get Medicaid benefits, adding to her stress and anxiety.

24.    Plaintiff V.G. is a resident of Vienna, Virginia.  She filed her asylum application on July 11, 2016.  She suffers from stress, anxiety, and depression associated with her uncertain legal status. She has also lost employment opportunities, including salary increases, because she lacks stable and ongoing employment authorization.

25.    Plaintiff R.K. is a resident of Rosedale, Maryland.  She filed her asylum application on October 10, 2017.  As she waits for a decision, she has suffered from stress and depression because of the continuing threat that she will have to return to Kenya.

26.     Plaintiff E.M. is a resident of Manassas, Virginia.  She filed her asylum application on July 5, 2017.  The delay in the adjudication of her application has prevented her from being with her three children who remain outside the United States.  This years-long separation has caused her stress, anxiety, and extreme sadness.

27.     Plaintiff A.N. is a resident of Lanham, Maryland.  She filed her asylum application on October 24, 2016.  The delay she is experiencing has caused her continuing mental distress that led her to seek counseling at the House of Ruth.  As she waits for a decision, she has been unable to leave the country to see family members for nearly seven years.  She also has been rejected for numerous jobs because of her unsettled employment status.  She has also been denied educational opportunities because her immigration status has prevented her from qualifying for scholarships.

28.     Plaintiff M.N. is a resident of Silver Springs, Maryland.  She filed an application for asylum on January 23, 2018.  USCIS's failure to adjudicate her application has exacerbated the mental distress caused by the trauma she suffered in Senegal which caused her to seek asylum.  Her health has been adversely affected by lack of access to Medicaid.  Her well-being has been harmed because she cannot travel outside the United States to see her only son.  Her financial well-being has been harmed by her inability to find anything other than low-paying short-term work because of her unsettled immigration status.

29.     Plaintiff C.O. is a resident of Houston, Texas.  She filed her asylum application on June 9, 2015.  She has suffered from prolonged anxiety because of uncertainty about her immigration status.  She has only been able to find work in temporary low-paying jobs such as a server/cleaner at restaurants.  She has also been unable to secure public benefits such as Medicaid, housing support, and food stamps because of her unsettled immigration status.

30.     Plaintiff R.O. is a resident of Houston, Texas.  She filed her asylum application on October 15, 2015.  She has been suffering from recurring chest pains and related symptoms caused the stress associated with her uncertain immigration status and her inability to see her children who remain in Nigeria.

31.     Plaintiff M.O. is a resident of Roanoke, Virginia.  She filed her asylum application on January 25, 2016.  Her prolonged wait for an adjudication of her application has caused her to suffer extraordinary stress.  Her children, who accompanied her to the United States and are seeking derivative asylee status, have by this point largely grown up in the United States and built their lives here.  Not knowing whether she and they can stay in the United States is a source of extreme distress for both M.O. and her five children who rely on her.

32.     Plaintiff A.R. is a resident of Baltimore, Maryland.  She filed her asylum application on January 19, 2017.  She is suffering from depression and anxiety as a result of her long wait for adjudication of her application.  She has also been unable to get a job commensurate with her training.

33.     Plaintiff G.U. is a resident of Severn, Maryland.  She filed her asylum application on July 21, 2015.  She came to the United States from Rwanda where she was persecuted because of her ethnic heritage.  She was tortured, raped, and forced to watch her mother being raped.  The trauma she suffered from that experience has been exacerbated by the prolonged delay in the adjudication of her asylum application and the unrelenting fear of being sent back to Rwanda.  In 2020 she sought the help of a psychologist, but she still continues to suffer emotional distress because of ongoing worry about the possibility she will be returned to Rwanda.  Despite getting a 4.0 GPA in a specialized job training course, she has only been able to work as a nursing assistant with a pay of $15/hour because of her unsettled immigration status.

34.    Plaintiff F.S. is a resident of Vienna, Virginia.  She filed her asylum application on August 17, 2015.  Like the other Plaintiffs, continued uncertainty as to her immigration status has caused F.S. to suffer extreme stress and anxiety.  She has also had difficulty securing employment while her immigration status is in limbo.

35.    Defendant USCIS is an agency within the Department of Homeland Security ("DHS") that is charged with administering visa applications.

36.    Defendant Ur Mendoza Jaddou is the Director of USCIS. As the Director of USCIS, Defendant Jaddou has responsibility for adjudicating "asylum and refugee applications." Defendant Jaddou is sued in her official capacity.

37.    Defendant DHS is an executive agency of the United States government.

38.    Defendant Alejandro Mayorkas is Secretary of DHS.  Defendant Mayorkas has joint responsibility with the Attorney General for adjudicating asylum applications.  Defendant Mayorkas is sued in his official capacity.

## FACTS

39.    The Immigration and Nationality Act ("INA"), as amended by the Homeland Security Act of 2002, gives the Secretary of Homeland Security and the Attorney General joint responsibility for adjudicating asylum applications.  *See* 8 U.S.C. § 1158(b)(1)(A).  The Homeland Security Act also specifies that the USCIS Director is the officer within DHS responsible for adjudicating "asylum and refugee applications." 6 U.S.C. § 271(b)(3).

40.    In general, a noncitizen who is physically present in the United States (whether or not here lawfully) and who fears persecution in their country of origin can apply for asylum by filing an "affirmative" asylum application with USCIS within one year of their most recent arrival in the country. *See* 8 U.S.C. § 1158.  This is distinct from the separate ability to seek

asylum "defensively" in a removal proceeding in immigration court.  Asylum may be granted to any applicant in the United States who is a refugee not statutorily barred from asylum status. 8 U.S.C. §§ 1158(b)(1)(A), 1101(a)(42)(A).

41.    After USCIS receives an affirmative asylum application, it is required to schedule an interview with the applicant at a USCIS office.  The location of an asylum interview depends on the location where the person seeking asylum resides.  USCIS schedules interviews at nine offices and two sub-offices, including (as relevant for Plaintiffs here) offices in Arlington, Virginia, and Houston, Texas.  "For asylum applicants who live far from an asylum office or an asylum sub-office, asylum offices schedule asylum interviews at USCIS field offices ('circuit ride' locations) as resources permit."[8]  Following the interview, the agency renders a decision on the asylum application.  In that decision, USCIS determines whether the applicant is present in the United States, whether the applicant meets the definition of "refugee" under the INA, whether the applicant is statutorily barred from being granted asylum, and whether the applicant merits a favorable exercise of discretion.  8 U.S.C. § 1158(b)(1)(A).  If the agency answers all those questions favorably to the applicant, the noncitizen receives a grant of asylum.

42.    Asylum confers important benefits.  It allows asylees to remain in the United States indefinitely, free from the threat of persecution they would otherwise face.  It also allows them to apply for legal permanent resident status and petition for derivative asylee status for their spouse and children—meaning if their spouse and children are still in their country of origin, they can lawfully be brought to the United States (and if they are already in the United States, it means they can lawfully remain and work here).  It enables them to obtain an unrestricted Social Security card, to lawfully seek employment, and to have access to Medicaid, disability benefits,

---

[8]  https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum/affirmative-asylum-interview-scheduling.

supplemental nutrition assistance programs, and other state-based social services.  In addition, it protects them from heightened risk of exploitation and dangerous conditions.[9]

43.    If the agency cannot answer all those questions favorably to the applicant, and the applicant does not have legal status in the United States, USCIS usually refers the applicant for removal proceedings in immigration court. A noncitizen referred to immigration court may renew the application for asylum in those proceedings.

44.    Those whose asylum applications remain pending before USCIS have no alternative way to pursue asylum in the United States until, and unless, USCIS adjudicates their applications.

45.    The INA provides statutory deadlines by which USCIS must schedule an asylum applicant's initial interview and render a decision.  Specifically, it provides that "in the absence of exceptional circumstances, the initial interview or hearing on the asylum application shall commence not later than 45 days after the date an application is filed," and that "final administrative adjudication or the asylum application … shall be completed within 180 days after the date an application is filed."  8 U.S.C. § 1158(d)(5)(A).

46.    At the time Plaintiffs filed their applications for asylum, USCIS scheduled the initial or affirmative asylum interviews (the necessary first step in the adjudication process) on a FIFO basis.

47.    On January 29, 2018, USCIS switched from a FIFO basis to a LIFO basis as the primary scheme for scheduling asylum interviews.  Specifically, USCIS stated (and still states) that it is scheduling "asylum interviews in the following order of priority:

- **First priority**: Applications that were scheduled for an interview, but the interview had to be rescheduled at the applicant's request or the needs of USCIS.

---

[9]  *See* ¶ 58, *infra*.

- **Second priority**: Applications that have been pending 21 days or less.

- **Third priority**: All other pending affirmative asylum applications will be scheduled for interviews starting with newer filings and working back towards older filings."[10]

48.    As contemporaneous internal USCIS emails admit, USCIS made this change under the "intense" "focus" of the "WH [White House] and DHS hq."[11]  According to a January 20, 2018, internal USCIS email, "S1 [then-Secretary of Homeland Security Kirstjen Nielsen] was keenly interested in LIFO for asylum cases and want[ed the agency] to implement that as *quickly* as possible."[12]  USCIS implemented the LIFO switch eight days later.

49.    USCIS delayed public notice of the change for a full week.  That delay was no accident.  As John Lafferty, then-Chief of the Asylum Division, wrote in a January 29, 2018, email: "Without the public notice, I don't think the advocates/attorneys would notice and figure out what's up until late this week, next week at the earliest."[13]

50.    USCIS says the reason for its switch to a LIFO system was "to deter individuals from exploiting the asylum backlog to obtain employment authorization by the filing of frivolous, fraudulent or otherwise non-meritorious asylum applications."[14]  USCIS assumed without analysis that, because an individual with a non-meritorious case for asylum could nevertheless qualify for employment authorization if 180 days have passed and no decision has been rendered on the application, a significant number of people seeking asylum must have done

[10] USCIS, *Affirmative Asylum Interview Scheduling*, available at: https://www.uscis.gov/humanitarian/refugees-and-asylum/asylum/affirmative-asylum-interview-scheduling
[11] USCIS email from Francis Cissna to Nuebel Kovarik, December 16, 2017, located at USCIS's Seventh Revised Response (S85.1) to Tahirih Justice Center's FOIA Request at 82.
[12] USCIS email from Francis Cissna to Jennifer Higgins et al. January 20, 2018, located at USCIS's Seventh Revised Response (S85.1) to Tahirih Justice Center's FOIA Request at 84 (emphasis in original).
[13] *See* USCIS Asylum Division Q&A regarding the change, located at USCIS's Seventh Revised Response (S87.1) to Tahirih Justice Center's FOIA Request at 75.  The Asylum Division of USCIS adjudicates affirmative asylum applications.
[14] USCIS Asylum Division Q&A regarding the change, located at USCIS's Seventh Revised Response (S87.1) to Tahirih Justice Center's FOIA Request at 66.

so. But USCIS had no evidence of such fraud by applicants—and certainly no evidence of any widespread fraud sufficient to make a material difference to the application backlog.

51.    USCIS compounded its unfounded speculation with fallacious reasoning. USCIS observed that, in a much earlier time period under very different circumstances (e.g., with many fewer asylum applications), a sustained decrease in applications followed the use of LIFO, while applications had increased under FIFO. The agency then assumed, without evidence, that FIFO and LIFO had caused those changes in application numbers, and that it would do so again in 2018.

52.    But USCIS knew that a switch to LIFO was unlikely to have a significant effect on the backlog of asylum applications. The agency ignored the fact, for instance, that at the same time the application backlog was increasing, USCIS had diverted asylum officers to work at the U.S.-Mexico border. And USCIS did not analyze in any systematic way whether other reassignments could have reduced the backlog. Nor did USCIS analyze whether the worsening persecution in countries of origin would render any assumed benefits from the switch illusory. In other words, there were more—and more likely—explanations for the increase in the backlog of asylum applications beyond the fact that the agency was processing them under a FIFO system. Yet the agency entirely failed to consider the effects of these other factors, including on asylum seekers such as Plaintiffs.

53.    Additionally, the agency knew that a switch to LIFO would not, and could not, reduce the number of applications submitted solely to obtain work authorization even assuming, contrary to the evidence, that people sought asylum solely for that reason. As internal USCIS emails reveal, even on the agency's own theory LIFO could reduce meritless applications "only

if EOIR fast tracks" cases referred by USCIS to immigration court.[15]  That is because absent

fast-tracking by EOIR, any incentive to file asylum applications for work authorization would

remain intact:  Even if USCIS moved quickly in its initial processing of applications, if EOIR did

not act quickly to dispose of the cases referred to it from USCIS (i.e., those cases in which

USCIS found that asylum could not be granted), then applicants would still receive temporary

work authorization during the pendency of their cases within immigration court, and hence

would still (under the agency's theory) have an incentive to file meritless or fraudulent

applications in the first place.  But as USCIS knew, EOIR did not prioritize referrals for

adjudication, and EOIR has not done so at any point since the switch to LIFO.

54.    Unsurprisingly, the agency's switch to LIFO has not succeeded in reducing the

backlog of asylum applications.  Indeed, the affirmative asylum backlog has grown since the

switch to LIFO.  On January 29, 2018, the time of the switch, there were 311,000 affirmative

asylum applications pending.[16]  By the end of FY 2019, the backlog had grown to 340,869.[17]  A

year later, it had increased again to 385,528.[18]  By the fourth quarter of FY2022, it had grown to

571,628.[19]

55.    USCIS also failed to consider other important consequences of the switch from

FIFO to LIFO.  For example, even assuming arguendo that USCIS had a reasonable basis for

believing the switch would reduce the backlog, USCIS gave no weight to the disproportional

incremental harm that the switch would have on applicants such as Plaintiffs who had already

---

[15] *See* USCIS email from Ted Kim to John Lafferty, December 18, 2017, located at USCIS's Seventh Revised Response (S85.1) to Tahirih Justice Center's FOIA Request at 81.

[16]  *See* USCIS Press Release, 01/31/2018 at https://www.uscis.gov/archive/uscis-to-take-action-to-address-asylum-backlog.  *See also* USCIS's Seventh Revised Response (S85.1) to Tahirih Justice Center's FOIA Request at 66-67.

[17]  Citizenship and Immigration Services Ombudsman Annual Report 2022, at 42. See also USCIS's Seventh Revised Response (S85.1) to Tahirih Justice Center's FOIA Request at 67.

[18] *Id.*

[19] *See* https://www.uscis.gov/sites/default/files/document/data/Quarterly_All_Forms_FY2022_Q4.pdf.

been waiting years for an interview and who would be pushed to the back of an ever-increasing line as a result of the switch.  The ever-growing backlog means that Plaintiffs, and others like them, who had applications already pending at the time of the switch have no meaningful likelihood of *ever* receiving a decision on their asylum applications under the LIFO system.  As a result of the extreme, functionally endless delays caused by the switch to LIFO, Plaintiffs have suffered injury to their health, well-being, family relationships, and financial status as set forth in ¶¶ 18-34.

56.     Perhaps most significantly, many asylum seekers, such as Plaintiffs E.M., A.N., M.N., and R.O., face a period of prolonged separation from spouses, children, and other family members—many of whom continue to face danger abroad—while their asylum applications remain pending.  That is because unlike individuals who have been *granted* asylum, individuals whose asylum applications remain pending are unable to sponsor qualifying family members for derivative asylee status.  That prolonged family separation imposes significant health and welfare risks not only on the applicants themselves—including "such acute feelings of hopelessness and depression that it can result in suicidality"—but also their family members as well:  Each additional day the applicant's application remains pending is another day that their family remains—often in continued danger—in their country of origin.[20]

57.     Even apart from prolonged family separation, the delays in processing asylum applications can have serious mental health consequences for applicants.  Many asylum seekers already suffer trauma from the persecution in their countries of origin, and the "prolonged delays in the adjudication of [their] asylum" applications resulting in "prolonged exposure to the …

---

[20] Human Rights First, Protection Postponed: Asylum Office Backlogs Cause Suffering, Separate Families, and Undermine Integration (2021), https://humanrightsfirst.org/wp-content/uploads/2022/09/ProtectionPostponed.pdf, at 5-6 (giving an example of a "Pakistani human rights activist" who "has waited for his asylum interview since 2015 while his wife and children remain in danger in Pakistan due to his work on behalf of marginalized groups").

uncertainty of future protection" can be a further "trauma trigger" for them, thereby

"compound[ing]" their earlier trauma.[21]  Such serious mental health consequences, including

compounded trauma, have affected Plaintiffs M.N., M.O., A.B., R.A., N.B., Z.D., N.E., V.G.,

A.E., R.K., A.N., C.O., A.R., F.S., and G.U.

58.    What is more, delays in the processing of asylum applications can expose

applicants to a heightened risk of exploitation and dangerous conditions, including homelessness.

Some housing programs, for instance, "require an interview date or a green card" for an

individual "to be eligible for assistance."[22]  Thus Plaintiff A.E. was unable to secure Workforce

Housing in Washington, D.C.  Additionally, although asylum seekers are eligible for temporary

work authorization after their applications have been pending for 180 days, not all employers are

willing to hire someone whose continued ability to work is not guaranteed.[23]  This can force even

asylum seekers who held high-skilled jobs in their countries of origin into lower-skilled, or even

exploitative, labor conditions, or cause others to lose employment opportunities.[24] That has been

the case with Plaintiffs N.B., A.E., A.N., C.O., M.N., V.G., A.R., F.S., and G.U.

59.    The public interest has also been harmed by USCIS's growing backlog under

LIFO.  As then-USCIS Director Cissna acknowledged after USCIS switched to LIFO, "lingering

backlogs . . . undermine national security and the integrity of the asylum system."[25]

The Agency thus has little reason to insist on processing Plaintiffs' applications via a LIFO

method, and consequently, compelling adjudication of Plaintiffs' applications by a FIFO method

would constitute at most a minimal intrusion on the Agency's activities.  USCIS could just as

---

[21] *Id.* at 6-7.
[22] *Id.* at 8.
[23] *Id.* at 9.
[24] *See id.* at 8-9.
[25] USCIS Press Release located at USCIS's Seventh Revised Response (S87.1) to Tahirih Justice Center's FOIA Request at 140.

readily switch back to FIFO as it switched away from FIFO in 2018.  Moreover, as the then-Chief of USCIS's Asylum Division recently wrote, "circumstances are appropriate for the agency to assign additional resources to the longest pending cases."[26]  Indeed, USCIS departed from LIFO to process all applications filed in FY 2014, which means USCIS can very well do the same thing for other pre-LIFO applications.  Indeed, as the Asylum Division Chief remarked: "Principles of program integrity and customer service support the allocation of resources to prioritize these [longest-pending] cases for immediate processing."[27]  Said otherwise, the question is not whether the Agency's resources are constrained, but how those limited resources should be allocated, and what Congress has required.  And the Agency and Congress have supplied the answer:  They should be used to first support those whose applications have been pending the longest, not intentionally withheld in a way that forever holds Plaintiffs in limbo to further a quixotic quest to combat the Agency's inchoate and unsupported fear of fraud.  Such action best comports with Congress's command as set forth both in the APA and the INA.

## COUNT I

(Violation of § 706(2)(A) of the APA)

### USCIS's Switch from FIFO to LIFO Was Unlawful Agency Action

60.    Plaintiffs restate and incorporate by reference each and every allegation contained in the preceding paragraphs.

61.    Under the APA, "[t]he reviewing court shall … hold unlawful and set aside agency action … found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).

---

[26] USCIS Memo located at USCIS's Seventh Revised Response (S87.1) to Tahirih Justice Center's FOIA Request at 197-198.
[27] *Id*.

62.      USCIS's January 29, 2018, switch from FIFO to LIFO was "not in accordance with law." The INA provides that "in the absence of exceptional circumstances, the initial interview or hearing on the asylum application shall commence not later than 45 days after the date an application is filed," and that "final administrative adjudication or the asylum application … shall be completed within 180 days after the date an application is filed." 8 U.S.C. § 1158(d)(5)(A). Each Plaintiff applied for asylum between January 1, 2015, and January 28, 2018, and none has yet to receive an initial interview, much less a final adjudication.

63.      USCIS cannot hide behind the "exceptional circumstances" language because at the time of switch, the backlog was no longer an "exception," it was the norm.  There has been a large and growing backlog of asylum applications since at least 2012 – a sufficiently long time to preclude a finding of an "exceptional circumstance."  In any event, even if there was an "exceptional circumstance" on January 29, 2018, the switch from FIFO to LIFO *increased* the mean wait time for *all* applicants considered collectively in contravention of Congress's implied mandate that *all* applicants receive at least the promptest interviews and adjudications possible when an exceptional circumstance precludes interviews within 45 days and adjudications within 180 days.

64.      In addition to being contrary to law, USCIS's January 29, 2018, switch was "arbitrary, capricious, [and] an abuse of discretion" for a number of other reasons, each of which is sufficient to render the switch unlawful.

65.      *First*, USCIS's determination that a switch from FIFO to LIFO was necessary to combat fraudulent or meritless applications was "contrary to the record evidence and thus arbitrary and capricious."  *Growth Energy v. EPA*, 5 F.4th 1, 32 (D.C. Cir. 2021).  Although USCIS's justification for the switch was to reduce "fraudulent" or "meritless" applications that

were supposedly contributing to a growing application backlog, USCIS performed no analysis to determine whether, or to what extent, such applications were actually contributing to that backlog (and whether, or to what extent, a switch from FIFO to LIFO would actually deter such applications or alleviate the backlog). In fact, the growing backlog had a number of obvious other causes such as an *increase* in legitimate asylum applications filed in response to growing gang violence and persecutions in Central America, at the same time as USCIS was *decreasing* the number of USCIS asylum officers conducting interviews. Indeed, USCIS proceeded with the switch even though it knew that a switch would *not* reduce fraudulent or meritless applications. As set forth above, USCIS knew at the time that LIFO could reduce such applications "only if EOIR [Executive Office for Immigration Review] fast tracks our referrals" to immigration court,[28] which USCIS knew EOIR was not doing.

66.      *Second*, USCIS "fail[ed] to consider … important aspect[s]" of the switch from FIFO to LIFO. *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42-43 (1983). For example, even assuming *arguendo* that USCIS had a reasonable basis for believing the switch would reduce the backlog, USCIS gave no weight to the disproportional incremental harm that the switch would have on applicants such as Plaintiffs who had been waiting years for an interview already and who would be pushed to the back of an ever-increasing line as a result of the switch. Nor did it consider the fact that the switch from FIFO to LIFO at a time when the backlog was more than 380,000 would almost certainly preclude many tens of thousands of meritorious applicants from ever getting an interview, consigning them to a lifetime apart from their spouses and children.

---

[28] *See* USCIS email from Ted Kim to John Lafferty, December 18, 2017, located at USCIS's Seventh Revised Response (S85.1) to Tahirih Justice Center's FOIA Request at 81.

67.     *Third*, USCIS failed to "afford[] adequate consideration to …

reasonable alternative[s]," *Pro. Pilots Fed'n v. FAA*, 118 F.3d 758, 763 (D.C. Cir. 1997), that

could have reduced the backlog without causing such disproportional harm to those already

waiting in line.[29]  Even though USCIS has acknowledged that a shift of asylum officers to the

border contributed to the growing backlog, USCIS did not analyze in any systematic way

whether other reassignments or other reallocation of resources could have reduced the backlog.

68.     *Fourth,* USCIS failed to consider Plaintiffs' reliance interest in the FIFO

system by retroactively switching to LIFO.  "Generally, an agency may not promulgate

retroactive rules without express congressional authorization." *Kirwa v. Dep't of Def.*, 285 F.

Supp. 3d 21, 40 (D.D.C. 2017).  But even where an agency has such lawful authority, it must still

"justify" any "retroactive shift in agency policy."  *New York State Bar Ass'n v. FTC*, 276 F.

Supp. 2d 110, 142 (D.D.C. 2003).  A failure to do so, no different than any other "fail[ure] to

consider an important aspect of the problem" or "relevant factor[]," constitutes arbitrary and

capricious action that cannot stand under the APA.  *State Farm*, 463 U.S. at 42-43.  At the time

Plaintiffs applied for asylum, they reasonably relied on USCIS's representations that their

applications would be considered within a reasonable time.  Yet USCIS failed to consider that

reliance.

69.     As a result of USCIS's illegal conduct, Plaintiffs have suffered irreparable

injury, including harm to their mental health, livelihood, and family relations.

---

[29] *See, e.g.,* ¶ 52, *supra.*

## COUNT II

(Violation of § 706(1) of the APA)

<u>Failing to Grant Plaintiffs Timely Initial Interviews</u>

70.    Plaintiffs restate and incorporate by reference each and every allegation contained in the preceding paragraphs.

71.    Section 706(1) provides that a "reviewing court shall compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1).

72.    In determining whether a delay in agency action is "unreasonabl[e]," courts consider the following factors:

   a.   whether "Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed";

   b.   "the nature and extent of the interests prejudiced by delay," with the understanding that where "human health and welfare are at stake," delays are considered "less tolerable"; and

   c.   whether or to what extent "expediting delayed action" will have an effect "on agency activities of a higher or competing priority." *Telecommunications Rsch. & Action Ctr. (TRAC) v. FCC*, 750 F.2d 70, 80 (D.C. Cir. 1984).

73.    Here, each of those factors weighs in favor of a finding that the adjudication of Plaintiffs' asylum applications has been unreasonably delayed.

74.    *First*, Congress has provided a timetable indicating the speed with which it expects the agency to proceed.  Specifically, the INA provides that "in the absence of exceptional circumstances, the initial interview or hearing on the asylum application shall commence not later than 45 days after the date an application is filed," and that "final

administrative adjudication of the asylum application … shall be completed within 180 days after the date an application is filed."  8 U.S.C. § 1158(d)(5)(A).  Congress has thus made clear that in all but "exceptional circumstances," applicants are to receive an initial interview within 45 days.  Here, the circumstances that have resulted in the delay in the processing of Plaintiffs' applications—the large and growing backlog of asylum applications, and the agency's switch to a LIFO system—are not the exception but the norm.  The former has existed for at least the last ten years, and the latter has been in place for nearly the last five years (and is of the agency's own making).

75.    *Second*, "the nature and extent of the interests prejudiced by delay" include "human health and welfare"—in the form of prolonged family separation, severe mental health consequences, and increased risk of exploitation and dangerous conditions including homelessness—which makes delay "less tolerable."

76.    *Third*, "expediting delayed action" on Plaintiffs' applications will have minimal, if any, effect "on agency activities of a higher or competing priority."  Indeed, USCIS has routinely created exceptions to its LIFO, including for those whose applications were filed prior to 2014.  Having granted exceptions to LIFO to expedite the consideration of *others'* applications, the agency cannot now claim that it would jeopardize its interests to grant similar exemptions to Plaintiffs.  Indeed, the then-Chief of USCIS's Asylum Division recently wrote, "circumstances are appropriate for the agency to assign additional resources to the longest pending cases."[30]

---

[30] USCIS Memo located at USCIS's Seventh Revised Response (S87.1) to Tahirih Justice Center's FOIA Request at 197-198.

77.     USCIS's continuing failure to grant Plaintiffs initial interviews constitutes "agency action unlawfully withheld or unreasonably delayed" in violation of § 706(1) of the APA.

78.     This Court should order USCIS to schedule each Plaintiff's asylum interview before scheduling interviews for anyone who submitted an asylum application after that Plaintiff's application.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request the Court to:

a.  Declare that USCIS acted in an arbitrary and capricious manner as to Plaintiffs when USCIS imposed a LIFO system in place of the FIFO system that was in effect when Plaintiffs filed their asylum applications.

b.  Order USCIS to set aside its unlawful switch from FIFO to LIFO, thus returning to the preexisting FIFO system.

c.  Enjoin USCIS from taking any action that increases the average wait time of asylum applicants.

d.  Order USCIS to schedule each Plaintiff's asylum interview before scheduling interviews for anyone who submitted an asylum application after that Plaintiff's application.

e.  Order USCIS to present this Court with a plan for reducing the backlog of asylum applications, and if necessary, appoint a trustee to prepare such a plan.

f.  Order such other relief as the Court deems necessary to ensure that Plaintiffs' asylum applications are adjudicated in a reasonable time.

.

Dated:   April 7, 2023

Respectfully submitted,


*/s/ Jonathan Direnfeld*
_____
Jonathan Direnfeld (No. 28859)
Thomas Fu*
Garret G. Rasmussen**
Monica A. Svetoslavov**
Jesse Beringer**
Dan Guerra**
Orrick, Herrington, & Sutcliffe
1152 15th St. N.W.
Washington, D.C. 20005
Telephone: (202) 339 8400
Fax: (202) 339 8500
jdirenfeld@orrick.com


*Attorneys for Plaintiffs*


*Application for admission to be filed
**Pro hac vice to be filed

.